disrespect for this court's disciplinary jurisdiction, the court finds that the proper sanction is disbarment.

## CONCLUSION

It is the judgment of this court that Respondent should be and is hereby disbarred from the practice of law, effective immediately. Respondent is directed to pay costs and expenses, if any, in accordance with Neb. Rev. Stat. §§ 7-114 and 7-115 (Reissue 2012).

Judgment of disbarment.

State of Nebraska, appellee, v. Kerstin M. Piper, also known as Kerstin M. Clarkson, appellant.

___ N.W.2d ___

Filed October 31, 2014.    No. S-13-1029.

1. **Criminal Law: Courts: Appeal and Error.** In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and its review is limited to an examination of the record for error or abuse of discretion.

2. **Courts: Appeal and Error.** Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record.

3. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

4. **Appeal and Error.** An appellate court independently reviews questions of law in appeals from the county court.

5. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below.

6. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

7. **Statutes.** Absent a statutory indication to the contrary, words in a statute will be given their ordinary meaning.

8. \_\_\_\_. It is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute.

9. \_\_\_\_. Statutes relating to the same subject matter will be construed so as to maintain a sensible and consistent scheme, giving effect to every provision.

10. **Statutes: Legislature: Intent: Appeal and Error.** In construing a statute, an appellate court's objective is to determine and give effect to the legislative intent of the enactment.

11. **Statutes.** A court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous.

12. **Motions to Suppress: Appeal and Error.** When a motion to suppress is overruled, the defendant must make a specific objection at trial to the offer of the evidence which was the subject of the motion to suppress in order to preserve the issue for review on appeal.

13. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.

14. **Pretrial Procedure: Rules of Evidence.** A suppression hearing is a preliminary hearing within the meaning of Neb. Evid. R. 1101(4)(b), Neb. Rev. Stat. § 27-1101(4)(b) (Reissue 2008).

15. \_\_\_\_: \_\_\_\_. In a criminal case, the Nebraska rules of evidence do not apply to suppression hearings.

16. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government.

17. **Constitutional Law: Highways: Motor Vehicles: Investigative Stops: Search and Seizure.** A vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment.

18. **Highways: Investigative Stops.** A highway checkpoint must be both authorized by an approved plan and conducted in a manner that complies with the plan and the policy established by the authority at the policymaking level.

Appeal from the District Court for Scotts Bluff County, Randall L. Lippstreu, Judge, on appeal thereto from the County Court for Scotts Bluff County, James M. Worden, Judge. Judgment of District Court affirmed.

Bell Island, of Island & Huff, P.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Wright, J.

## I. NATURE OF CASE

Kerstin M. Piper, also known as Kerstin M. Clarkson, appeals from the district court's order which affirmed her conviction and sentence in the county court for driving while under the influence (DUI), second offense. She challenges the county court's determinations that the Nebraska rules of evidence did not apply at the hearing on her motion to suppress and that the Nebraska State Patrol checkpoint at which Piper was stopped was constitutional. Finding no error in these determinations, we affirm the order of the district court which affirmed Piper's conviction and sentence.

## II. SCOPE OF REVIEW

[1-5] In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and its review is limited to an examination of the record for error or abuse of discretion. *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011). Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record. *Id*. When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id*. But we independently review questions of law in appeals from the county court. *Id*. Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below. See *State v. Taylor*, 286 Neb. 966, 840 N.W.2d 526 (2013).

[6] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Matit*, 288 Neb. 163, 846 N.W.2d 232 (2014). Regarding historical facts, we review the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. *Id*.

## III. FACTS

On July 14, 2012, at approximately 12:30 a.m., the vehicle driven by Piper was stopped at a vehicle checkpoint in Scotts Bluff County, Nebraska. Nebraska State Patrol Trooper Edward J. Petersen approached the vehicle and asked to see Piper's driver's license, vehicle registration, and proof of insurance. He observed that Piper's eyes were bloodshot and watery and that an odor of alcohol was emanating from the vehicle. There were two other people in the vehicle besides Piper.

At Petersen's instruction, Piper drove her vehicle to a nearby parking lot and joined Petersen in his cruiser. Inside the cruiser, Petersen noted an odor of alcohol emanating from Piper's person and decided to administer several standardized, as well as nonstandardized, field sobriety tests, including a preliminary breath test. Because the preliminary breath test registered a breath alcohol content of .174 of 1 gram of alcohol per 210 liters of breath, Petersen arrested Piper for DUI.

At the Scotts Bluff County corrections facility, Petersen administered a chemical breath test, which produced a result of .134 of 1 gram of alcohol per 210 liters of breath. Piper was subsequently charged by complaint in county court with DUI, second offense. (She had previously been convicted of DUI in 2005.)

Piper moved to suppress "all fruits of the illegal search and seizure, and her subsequent arrest." At the suppression hearing, over Piper's objection, the county court determined that the rules of evidence did not apply.

The State adduced evidence regarding the administration of the July 14, 2012, checkpoint. Petersen testified that the operation of the checkpoint was governed by State Patrol policy; that the checkpoint was operated according to a plan approved by Sgt. Dana Korell, who worked in a "supervisory capacity" at the State Patrol; and that to Petersen's knowledge, every car that came through the checkpoint was stopped. He also testified to the purpose for the checkpoint: "[W]e were specifically doing a DUI — you know, it was an alcohol-related enforcement project." He further explained, "I was paid through an alcohol enforcement grant. And that's what we were targeting

was alcohol-related violations, but I was just told that this was just a vehicle check." Piper offered no evidence at the suppression hearing.

The county court suppressed all evidence of the horizontal gaze nystagmus test, the nonstandardized field sobriety tests, and the preliminary breath test. It concluded that (1) the July 14, 2012, checkpoint "conform[ed] to the standard established . . . for a proper police 'check point'"; (2) the odor of alcohol and Piper's watery eyes justified Petersen's continued investigation; and (3) there was probable cause to arrest Piper.

At the start of trial, Piper renewed her objection to any evidence obtained from the July 14, 2012, checkpoint. The county court stated that it was "reaffirming" its ruling on the motion to suppress, but recognized Piper's continuing objection on the issue. Piper also objected to the State's adducing any evidence regarding the checkpoint, because it "has already been litigated" and would thus be irrelevant. The court ruled as follows:

> So as far as any objections to testimony or information regarding the checkpoint, I will — I'm going to have to reserve my rulings for the — for the trial. If [the prosecutor] gets extremely detailed and I think we're wasting time, then, of course, an objection will probably be appropriate, and I'll probably sustain it, but I can't — I can't prejudge that.

Piper did not make any additional objections that the State's evidence regarding the checkpoint was repetitive.

The State presented evidence that the plan for the July 14, 2012, checkpoint was prepared by Lt. Jamey Balthazor and approved by Korell and that the checkpoint was governed by State Patrol "policy [No.] 07-29-01." The approved plan and policy No. 07-29-01 were received as exhibits. Balthazor testified that "[e]very car that came through [the checkpoint] was either stopped or had been through previously, at which time we identified the driver and the vehicle, and we did not recheck them after they had already been checked once." Another State Patrol officer who helped administer the checkpoint gave similar testimony.

The jury found Piper guilty of DUI, second offense. She was sentenced to 18 months' probation and ordered to pay a $500 fine. Additionally, her driver's license was revoked for 1 year.

Piper appealed to the district court. She claimed that the county court erred in failing to apply the rules of evidence at the suppression hearing and in failing to sustain the motion to suppress, because the checkpoint was invalid.

The district court affirmed Piper's conviction and sentence. Relying on *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011), it concluded that the rules of evidence did not apply to suppression hearings. It also found that the checkpoint was lawful, because it was implemented "pursuant to a written action plan adopted by the Nebraska State Patrol for this particular vehicle check stop" and because the "date, time, location, and method of selecting motorists to stop were not selected by the troopers in the field." The court held that the stop of Piper's vehicle was "not made at Petersen's 'unfettered discretion.'"

Piper timely appealed. Pursuant to our statutory authority to regulate the dockets of the appellate courts of this state, we moved the case to our docket. See Neb. Rev. Stat. § 24-1106(3) (Reissue 2008).

## IV. ASSIGNMENTS OF ERROR

Piper assigns that the county court erred in (1) determining that the rules of evidence do not apply to a motion to suppress hearing and (2) failing to sustain Piper's motion to suppress the evidence obtained as a result of the stop, because the checkpoint was constitutionally invalid. By inference, she assigns that the district court erred in upholding the judgment of the county court.

## V. ANALYSIS

The questions presented by this appeal are (1) whether the rules of evidence apply at suppression hearings and (2) whether Piper's motion to suppress should have been sustained because the State Patrol checkpoint was unconstitutional. We address each question in turn.

### 1. APPLICATION OF RULES OF EVIDENCE
### AT SUPPRESSION HEARING

There are two statutes applicable to our determination whether the rules of evidence apply to a suppression hearing. Neb. Evid. R. 104, Neb. Rev. Stat. § 27-104 (Reissue 2008), provides in pertinent part as follows:

> (1) Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the judge, subject to the provisions of subsection (2) of this section.
>
> . . . .
>
> (3) Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require, or when an accused is a witness, if he so requests.

Neb. Evid. R. 1101, Neb. Rev. Stat. § 27-1101 (Reissue 2008), states as follows:

> (1) The Nebraska Evidence Rules apply to the following courts in the State of Nebraska: Supreme Court, Court of Appeals, district courts, county courts, and juvenile courts. . . .
>
> (2) The rules apply generally to all civil and criminal proceedings, including contempt proceedings except those in which the judge may act summarily.
>
> . . . .
>
> (4) The rules, other than those with respect to privileges, do not apply in the following situations:
>
> . . . .
>
> (b) Proceedings for extradition or rendition; preliminary examinations or hearings in criminal cases; sentencing or granting or revoking probation; issuance of warrants for arrest, criminal summonses, and search warrants; and proceedings with respect to release on bail or otherwise.

[7-10] In interpreting these statutes, we apply well-established principles of statutory interpretation. Statutory

interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below. *State v. Taylor*, 286 Neb. 966, 840 N.W.2d 526 (2013). Absent a statutory indication to the contrary, words in a statute will be given their ordinary meaning. *State v. Au*, 285 Neb. 797, 829 N.W.2d 695 (2013). And it is well established that it is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute. *State v. Medina-Liborio*, 285 Neb. 626, 829 N.W.2d 96 (2013). Statutes relating to the same subject matter will be construed so as to maintain a sensible and consistent scheme, giving effect to every provision. *State v. Hamilton*, 277 Neb. 593, 763 N.W.2d 731 (2009). In construing a statute, our objective is to determine and give effect to the legislative intent of the enactment. *State v. Hernandez*, 283 Neb. 423, 809 N.W.2d 279 (2012).

This court has never explicitly considered whether the rules of evidence apply at suppression hearings. But we have held, more generally, that under § 27-104, the rules of evidence do not apply to a trial court's preliminary rulings on the admissibility of evidence.

In *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011), we considered whether the rules of evidence applied during a pretrial hearing to determine if a certain hearsay statement qualified as an excited utterance. The defendant had argued that the rules of evidence applied, because § 27-104 differed from the corresponding federal rule. Fed. R. Evid. 104(a) explicitly stated that in determining preliminary questions of admissibility, a court was "'not bound by the rules of evidence except those with respect to privileges.'" See *Pullens*, 281 Neb. at 841, 800 N.W.2d at 217 (quoting Fed. R. Evid. 104(a)). Section 27-104 omitted this statement so as "to avoid 'unduly encourag[ing] the trial judge to depart from the usual rules.'" See *Pullens*, 281 Neb. at 841, 800 N.W.2d at 217 (alteration in original).

We rejected the argument that this omission meant Nebraska had adopted a position contrary to that of federal law. We

determined that the "'usual rules'" in Nebraska "largely coincided" with the federal rules. See *id.* at 845, 800 N.W.2d at 219. We stated that Nebraska's rules of evidence were consistent with the U.S. Supreme Court's statement in *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974), that "'the rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence.'" See *Pullens*, 281 Neb. at 843, 800 N.W.2d at 218. Finally, we explained that there was "no logical necessity" to apply the rules of evidence to preliminary determinations of admissibility, because "the trial judge's experience and legal training can be relied on to inform crucial distinctions and to reveal the inherent weakness of evidence by affidavit or hearsay." See *id.*

Because the instant case does not present a hearsay question, Piper argues that *Pullens* is not applicable. But we do not agree. The question in *Pullens* was whether the rules of evidence applied to the evidence considered by a trial court when determining a preliminary question of the admissibility of evidence. It was not crucial to our holding that the court in *Pullens* was faced with a question about the admissibility of hearsay. Rather, our determination was based on "a historical analysis of preliminary determinations of admissibility" and the intent behind § 27-104. See *Pullens*, 281 Neb. at 841, 800 N.W.2d at 217.

*Pullens* is relevant and applicable to the instant case. It tells us that the interpretation of the Nebraska rules of evidence regarding preliminary questions of admissibility is consistent with the interpretation of the corresponding federal rules. See *Pullens, supra.* It also tells us that § 27-104 was never intended to treat preliminary questions of admissibility differently than Fed. R. Evid. 104(a). The federal approach is that the rules of evidence do not usually apply at hearings to determine preliminary questions of admissibility, including suppression hearings. See, Fed. R. Evid. 104(a); *United States v. Raddatz*, 447 U.S. 667, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (1980); *Matlock, supra.* See, also, e.g., *U.S. v. Stepp*, 680 F.3d 651 (6th Cir. 2012); *U.S. v. Thompson*, 533 F.3d 964 (8th Cir. 2008); *U.S. v. Miramonted*, 365 F.3d 902 (10th Cir. 2004); *U.S.*

*v. Bunnell*, 280 F.3d 46 (1st Cir. 2002); *U.S. v. Dickerson*, 166 F.3d 667 (4th Cir. 1999), *reversed on other grounds* 530 U.S. 428, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000); *U.S. v. Hodge*, 19 F.3d 51 (D.C. Cir. 1994); *United States v. Bent-Santana*, 774 F.2d 1545 (11th Cir. 1985), *abrogated on other grounds*, *Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990); *United States v. de la Fuente*, 548 F.2d 528 (5th Cir. 1977); *United States v. Bolin*, 514 F.2d 554 (7th Cir. 1975). Because our interpretation of the rules of evidence is meant to be the same as the federal rules, we conclude that under § 27-104, the rules of evidence do not apply at hearings to determine preliminary questions of admissibility, including suppression hearings.

We reach the same conclusion under § 27-1101(4)(b), which provides that the Nebraska rules of evidence do not apply to "preliminary examinations or hearings in criminal cases." Our rules of evidence do not specify what types of hearings qualify as preliminary hearings. Absent a statutory indication to the contrary, words in a statute will be given their ordinary meaning. *State v. Au*, 285 Neb. 797, 829 N.W.2d 695 (2013).

[11] Piper advocates against giving the term "preliminary hearings" in § 27-1101(4)(b) its ordinary meaning. She argues that preliminary hearings are the same as preliminary examinations and that the language "preliminary examinations or hearings" refers only to proceedings held pursuant to Neb. Rev. Stat. § 29-1607 (Reissue 2008). She claims that as a result, the exception for "preliminary examinations or hearings" in § 27-1101(4)(b) applies only to the "preliminary examination" that is required to be held prior to the filing of an information. See § 29-1607. We reject Piper's argument, because § 27-1101(4)(b) includes "preliminary examinations *or hearings*." (Emphasis supplied.) If we accepted Piper's assertion that preliminary hearings are the same as preliminary examinations, then the statutory language "or hearings" would be rendered superfluous. But a court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous. *Hess v. State*, 287 Neb. 559, 843 N.W.2d 648 (2014).

There is no statutory indication that the reference to preliminary hearings in § 27-1101(4)(b) was meant to carry a special or limited meaning. Accordingly, we look to its ordinary meaning. Something that is preliminary is "something that precedes a main discourse, work, design, or business" or "something introductory or preparatory." Webster's Third New International Dictionary of the English Language, Unabridged 1789 (1993). Given this definition, a suppression hearing qualifies as a preliminary hearing.

A suppression hearing precedes the "main discourse" of a criminal case in the sense that a motion to suppress is decided prior to trial. See *id*. Neb. Rev. Stat. § 29-822 (Reissue 2008) provides that any person claiming an unlawful search and seizure generally must move to suppress the evidence so obtained at least 10 days before trial and that unless a claim of unlawful search and seizure is raised by motion before trial, it is deemed waived. "[I]t is clearly the intention of [§ 29-822] that motions to suppress evidence are to be ruled on and finally determined before trial, unless the motion is within the exceptions contained in the statute." *State v. Harms*, 233 Neb. 882, 892, 449 N.W.2d 1, 8 (1989).

[12-14] A suppression hearing is also preparatory, because it relates to "auxiliary" issues "not immediately relevant to the question of guilt" and is held in anticipation of certain evidence being introduced at a forthcoming trial. See Wayne R. LaFave et al., Criminal Procedure § 10.1 at 557 (5th ed. 2009). Additionally, "[w]hen a motion to suppress is overruled, the defendant must make a specific objection at trial to the offer of the evidence which was the subject of the motion to suppress in order to preserve the issue for review on appeal." See *State v. Smith*, 269 Neb. 773, 784, 696 N.W.2d 871, 882 (2005). And thus, "[w]hen a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress." See *State v. Bromm*, 285 Neb. 193, 199, 826 N.W.2d 270, 275 (2013). A suppression hearing is a preliminary hearing within the meaning of § 27-1101(4)(b).

[15] For the foregoing reasons, we conclude that in a criminal case, our rules of evidence do not apply to suppression hearings. The district court did not err in affirming the county court's determination that it was not bound by the rules of evidence when considering Piper's motion to suppress.

## 2. Constitutionality of Checkpoint

The second question presented by Piper's appeal is whether all evidence obtained as a result of the July 14, 2012, checkpoint should have been suppressed because the checkpoint was unconstitutional. The county court concluded the checkpoint was constitutional and overruled the motion to suppress on two occasions—before trial and again during trial. On appeal, the district court also concluded that the checkpoint was constitutional and affirmed the county court's decision not to suppress the evidence.

Piper argues that in reviewing the constitutionality of the checkpoint, we should consider only that evidence adduced at the suppression hearing. We disagree. When a motion to suppress is overruled pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearing on the motion to suppress. *Bromm*, *supra*. Therefore, in reviewing the district court's conclusion that the county court did not err in determining that the checkpoint was constitutional, we consider the evidence adduced both at the suppression hearing and at the trial.

### (a) Background Legal Principles

[16,17] The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government. *State v. Matit*, 288 Neb. 163, 846 N.W.2d 232 (2014). "[A] vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment." *Indianapolis v. Edmond*, 531 U.S. 32, 40, 121 S. Ct. 447, 148 L. Ed. 2d 333 (2000). See, also, *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990); *Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979). Whether a checkpoint is lawful thus depends

upon whether it is reasonable. See *Sitz, supra*. "The reasonableness of seizures that are less intrusive than a traditional arrest . . . depends '"on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."'" *Brown v. Texas*, 443 U.S. 47, 50, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979) (citations omitted).

The public interest served by a checkpoint is assessed according to the primary purpose of the checkpoint. See *Edmond, supra*. A court does not look at the subjective intent of individual law enforcement officers administering the checkpoint, but examines purpose "at the programmatic level." See *id*., 531 U.S. at 48.

The U.S. Supreme Court has upheld the constitutionality of checkpoints "designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety." *Id*., 531 U.S. at 41. In *Sitz*, 496 U.S. at 447, the Court approved the use of "sobriety checkpoints" meant to prevent drunken driving. And in *Illinois v. Lidster*, 540 U.S. 419, 124 S. Ct. 885, 157 L. Ed. 2d 843 (2004), the Court ruled that law enforcement could legally conduct checkpoints seeking information about a specific, recently committed hit-and-run accident.

Conversely, a vehicle checkpoint whose primary purpose was "to uncover evidence of ordinary criminal wrongdoing" violated the Fourth Amendment. See *Edmond*, 531 U.S. at 42. In *Edmond*, the Court explained:

> We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes. We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime.

531 U.S. at 44.

The purpose of a checkpoint must be balanced against the checkpoint's "intrusion" on motorists' individual rights. See *Prouse*, 440 U.S. at 654. See, also, *Brown, supra*. The intrusion effectuated by a checkpoint can, depending on the

circumstances, be "slight" and "minimal." See *Sitz*, 496 U.S. at 451, 452. However, even where a checkpoint effectuates only a limited intrusion, it cannot subject motorists to "the unbridled discretion of law enforcement officials." See *Prouse*, 440 U.S. at 661. A "central concern in balancing" the public interest and the interference with individual liberty is "to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." See *Brown*, 443 U.S. at 51.

In *State v. Crom*, 222 Neb. 273, 383 N.W.2d 461 (1986), we adopted the "unfettered discretion" standard of *Brown*. Several on-duty police officers, none of whom ranked higher than sergeant, had decided to set up unplanned, "transitory" checkpoints during their shift. See *Crom*, 222 Neb. at 274, 383 N.W.2d 461. The checkpoints were not governed by "any standards, guidelines, or procedures promulgated by the policymakers for the police department or other law enforcement agency." See *id*. at 274, 383 N.W.2d at 461-62. Rather, "[t]he officers were free to move the checkpoint from place to place and in fact established a number of such checkpoints at different locations throughout the city of Omaha at various times, as they alone saw fit." See *id*. at 274, 383 N.W.2d at 462.

We concluded that such checkpoints were unconstitutional. We explained that because "there was no plan formulated at the policymaking level of the Omaha Police Department, or elsewhere," the officers in the field were "left free to decide when, where, and how to establish and operate the transitory checkpoint in question." *Id*. at 277, 383 N.W.2d at 463. As such, motorists stopped at the checkpoints were subjected "to arbitrary invasion solely at the unfettered discretion of officers in the field." See *id*.

### (b) Application to July 14, 2012, Checkpoint

Considering these principles within the context of the instant appeal, we conclude that the July 14, 2012, checkpoint was reasonable. It was established for a permissible

purpose, involved only minimal intrusion, and was not operated according to the unfettered discretion of law enforcement officers.

### (i) Purpose

Petersen testified that although the checkpoint was called a "vehicle check," it was funded by an "alcohol enforcement grant" and was part of an "alcohol-related enforcement project." He explained that the purpose of the checkpoint was to "target[] alcohol-related violations." Based on this evidence, the programmatic purpose of the checkpoint was comparable to that of the sobriety checkpoints upheld in *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S. Ct. 2481, 110 L. Ed. 2d 412 (1990), and was thus permissible.

### (ii) Intrusion

The intrusion caused by the checkpoint was minimal. Absent signs of criminal activity, each vehicle was stopped for only a brief period of time—the driver of each vehicle was allowed to proceed after an officer conducted a brief check of the motorist's condition, driver's license, vehicle registration, and insurance card, as well as the vehicle's lights, turn signals, brakes, horn, and windshield wipers. All vehicles were stopped. Thus, the intrusion caused by the checkpoint was no greater than the minimal intrusion caused by the checkpoints in *Sitz*.

### (iii) Discretion of Officers

Piper argues that the July 14, 2012, checkpoint subjected motorists to the unfettered discretion of officers in the field, because the plan was "not formulated by a person at the policy making level, but by a person involved in the field." See brief for appellant at 15. She cites to *State v. Crom*, 222 Neb. 273, 277, 383 N.W.2d 461, 463 (1986), in which we held that a checkpoint subjected motorists to the "unfettered discretion of officers in the field" and was thus unconstitutional, because "there was no plan formulated at the policy-making level."

Piper acknowledges that the plan for the July 14, 2012, checkpoint was approved by a supervisor within the State

Patrol. But she argues that this approval was not sufficient to make the checkpoint at which she was stopped constitutional. She alleges that the plan was not "formulated" at the policymaking level, because it was written by a nonsupervisor, and that

> [m]erely having the formality of rubber stamping a plan at the supervisory level is insufficient. A plan must start at the top and work its way down to officers in the field, not vice-versa. When the officer's [sic] in the field create the plan and seek approval, it is an unconstitutional checkpoint.

See brief for appellant at 15. In effect, Piper argues that as it was used to describe the unconstitutional checkpoint in *Crom*, the term "formulated" meant "conceived" or "created."

But in the context of *Crom*, "formulated" refers to acts which would make a plan binding, such as approval and endorsement by an individual at the policymaking level. *Crom* did not hold, as Piper argues, that the plan for a checkpoint must be conceived at the policymaking level in order for the checkpoint to pass the test for unfettered discretion.

Any question as to the meaning of "formulated" in *Crom* was clarified by *State v. One 1987 Toyota Pickup*, 233 Neb. 670, 447 N.W.2d 243 (1989), *overruled on other grounds, State v. Spotts*, 257 Neb. 44, 595 N.W.2d 259 (1999). There, we considered whether a checkpoint that was operated according to a plan created by an officer in a nonsupervisory capacity met the test established in *Crom*. If "formulated" meant "conceived" or "created," the fact that the checkpoint plan in *One 1987 Toyota Pickup* was created by a nonsupervisor would have been the determinative fact in our analysis. But it was not. Instead, in holding the checkpoint unconstitutional, we focused on the fact that the officers conducting the checkpoint had deviated from the plan by changing the date, time, location, and type of checkpoint without obtaining "reapproval." See *id*. at 674, 447 N.W.2d at 246. We read "formulated" as meaning "approved."

[18] In addition to clarifying the meaning of "formulated," *One 1987 Toyota Pickup* established that a highway checkpoint must be both authorized by an approved plan and

conducted in a manner that complies with the plan and the policy established by the authority at the policymaking level. As such, to determine whether the discretion of the officers operating a checkpoint was sufficiently constrained, we consider whether the checkpoint was approved and whether it was operated in accordance with the approved plan and State Patrol policy, as well as any other circumstances that may indicate the exercise of unfettered discretion.

In the instant case, the checkpoint did not involve the exercise of unfettered discretion. As we explain below, the discretion of the officers conducting the checkpoint was limited by an approved plan that conformed to State Patrol policy. Operation of the checkpoint did not deviate from the plan or the policy.

The existence of a valid checkpoint plan limited the discretion of the officers conducting the checkpoint. The plan was valid, because as required by paragraph II(A)(2) of policy No. 07-29-01, the decision to conduct the checkpoint was made by "a neutral source, such as a supervisor who is not involved in conducting the operation in the field." Korell made the decision to operate the checkpoint by approving and signing the plan. And he was a "neutral source," because he was a supervisor and did not participate in conducting the checkpoint. The approved plan established the date, time, location, and duration of the checkpoint, as well as the pattern for placement of signs and flares. In operating the checkpoint, the officers did not deviate from the plan.

All remaining aspects of the checkpoint were delineated by State Patrol policy No. 07-29-01. The policy specified that "[a]ll vehicles must be stopped and checked" except when there was heavy traffic flow or there were more than three waiting vehicles per officer. It required that each stopped vehicle be checked for 10 specific items, including driver's license, vehicle registration, proof of insurance, and "driver's condition." The policy prohibited officers from asking motorists to get out of their vehicles unless "violations of the law [were] detected or reasonably suspected." Thus, the policy significantly constrained the exercise of discretion by the officers administering the checkpoint.

Piper argues that the checkpoint violated paragraph II(A)(7) of policy No. 07-29-01, because the officers conducting the checkpoint "made a decision not to stop every car." See brief for appellant at 16. Piper is referring to the fact that in the case of vehicles that approached the checkpoint on multiple occasions, the officers "did not recheck them after they had already been checked once." This occurred with either one or two vehicles. They were stopped on their initial approach to the checkpoint. But after the initial stop, the officers waved the repeat vehicles through the checkpoint once they had ascertained that it was the same driver. No evidence was adduced about the reason these vehicles approached the checkpoint on multiple occasions. However, at trial, the parties' attorneys suggested that the vehicles were driven by designated drivers for a local celebration that was going on at the time.

The fact that these vehicles were stopped only on their first approach to the checkpoint did not violate State Patrol policy No. 07-29-01. Paragraph II(A)(7) of the policy required "[a]ll vehicles" to be "stopped and checked." At the July 14, 2012, checkpoint, all vehicles were stopped and checked. Each vehicle that approached the checkpoint was stopped without exception. Vehicles that were waved through the checkpoint had been stopped and inspected on their first pass through the checkpoint. Thus, no vehicle escaped being stopped and checked at the checkpoint.

Piper does not argue that the checkpoint violated any other provisions of the policy, and we find no evidence of any violations. As such, we find that operation of the checkpoint complied with State Patrol policy.

### (iv) Conclusion as to Constitutionality of Checkpoint

The July 14, 2012, checkpoint was administered for an appropriate purpose, the intrusion caused by the checkpoint was minimal, and the officers were not allowed to exercise unfettered discretion in the administration of the checkpoint. The district court did not err in affirming the order of the county court which overruled Piper's motion to suppress the

evidence obtained as a result of the checkpoint as the fruit of an illegal search and seizure.

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's order which affirmed the county court's judgment of conviction and sentence.

AFFIRMED.

––––––––––––––

STATE OF NEBRASKA, APPELLEE, V. JESUS R. CASTILLO-ZAMORA, APPELLANT.
___ N.W.2d ___

Filed October 31, 2014.    No. S-14-020.

1. **Rules of Evidence.** In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the rules, not judicial discretion, except in those instances when judicial discretion is a factor involved in the admissibility of evidence.

2. **Rules of Evidence: Appeal and Error.** When judicial discretion is not a factor, whether the underlying facts satisfy the legal rules governing the admissibility of such evidence is a question of law, subject to de novo review.

3. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law, which an appellate court reviews independently of the lower court's determination.

4. **Motions for Mistrial: Appeal and Error.** Whether to grant a mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion.

5. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court will review for clear error the factual findings underpinning a trial court's hearsay ruling and review de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds.

6. **Effectiveness of Counsel: Appeal and Error.** In reviewing claims of ineffective assistance on direct appeal, an appellate court is deciding only questions of law: Are the undisputed facts contained within the record sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance?

7. **Effectiveness of Counsel: Constitutional Law: Statutes: Appeal and Error.** If the alleged ineffective assistance claim rests solely on the interpretation of a statute or constitutional requirement, which claims present pure questions of law, an appellate court can decide the issue on direct appeal.